UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALBERT JONES                                                    CIVIL ACTION

VERSUS                                                          NO. 06-2875

ST. TAMMANY PARISH SHERIFF ET AL.                              SECTION "I" (2)


## REPORT AND RECOMMENDATION

Plaintiff, Albert Jones, is a prisoner currently incarcerated in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against St. Tammany Parish Sheriff Rodney Strain, St. Tammany Parish Sheriff's Deputies Hiser, Hart and Freeman, and St. Tammany Parish jail Drs. French and Higgins.  Plaintiff alleges in his complaint that, during his incarceration in the St. Tammany Parish jail, his right hand was broken when it was slammed in a closing cell door and that he did not receive proper medical care for the resulting injuries to his hand or for his preexisting psychiatric condition. Record Doc. No. 1 (Complaint at ¶¶ IV, V).  Although his complaint does not specifically challenge the conditions of his confinement, certain grievance forms concerning the conditions he experienced while temporarily housed in a disciplinary cell are attached to his original lawsuit.  He seeks $1.2 million in damages for "pain, suffering and mental anguish."  Id. at ¶ VI.

On October 31, 2006, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Bradley Lewis, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and its progeny.

Prior to the October 31st conference, plaintiff submitted a written statement to the court alleging that he had been transferred from the St. Tammany Parish jail to a state Department of Corrections ("DOC") facility as retaliation for having filed the instant lawsuit. During his testimony, plaintiff stated that he does <u>not</u> wish to assert such a retaliation claim in this case and acknowledged that his transfer to a DOC facility was proper after his probation for a previous conviction was revoked. Plaintiff's testimony was considered a motion voluntarily to dismiss this retaliation claim pursuant to Fed. R. Civ. P. 41(a), and a partial dismissal order was subsequently entered as to this claim by the presiding district judge. Record Doc. Nos. 29 and 30.

## THE RECORD

Plaintiff testified that the claims he makes in this case arise from his former incarceration in the St. Tammany Parish jail in Covington, Louisiana, for about six months from February until July 10, 2006. He stated that he was in the St. Tammany Parish jail from the time of his arrest on a charge of domestic violence against his wife. He said that, at the time of this arrest, he was on probation on an August 27, 2004

2

conviction for terrorizing.  He testified that he was convicted of the domestic violence charge on May 5, 2006 and was sentenced to two years probation, but his earlier probation on the terrorizing charge was revoked on the same day.  He said he is currently serving three years in prison on the terrorizing conviction.

Jones confirmed that his claim in this case arises from an incident in the St. Tammany Parish jail on March 29, 2006, when his "hand got slammed, got shut, in a cell where I was . . . in St. Tammany Parish jail, and I broke my right hand."  He said that he was standing near the cell door at about 11 a.m. on that day, talking to other inmates who were preparing for lunch, "and all of a sudden the guard hit the gate and when she hit the gate, my hand was between the gate, and it shut my hand in the gate, and I was trying to squeeze it out.  I squeezed some of it out, and it broke."  He confirmed that the cell gate was an automatic or electronic gate, and he identified the guard who closed it on his hand as the defendant, Deputy Hiser.

Jones testified that the other two deputies whom he named as defendants in this case had nothing to do with shutting the gate, but instead had been named as defendants because they had placed him in improper conditions of confinement.  He stated that defendant Deputy Hart had locked him in "the cookie jar," an area of the jail that was formerly a medical dormitory, where the deputy kept him for 12 hours, from about 6 a.m. until 6 p.m. on a date after he broke his hand.  Jones complained that "it was freezing

3

cold, and it was dirty, dirty trays all around in the cell, and there was spit all on the toilets, . . .   It was contaminated.  I could have caught some bad germs in there." Similarly, he testified that defendant Deputy Freeman had also locked him in "the cookie jar" for 12 hours on a separate occasion well before he broke his hand.

Asked to describe the conditions to which he was exposed during these two separate 12-hour time periods, plaintiff testified that "in this room, it used to be an old medical dorm , . . . [there are] two little parts to it where you could lock somebody in it, but really it's used for using the bathroom. . . . It's very, very cold in there, and it had spit and everything all in the toilets, dirty trays on the floor, and all kind of shit all over it. . . . It was very, very nasty."

As to the incident in which his hand was caught in the closing cell door, Jones said that Deputy Hiser "wasn't paying attention, I guess, because it was around lunch time, and they were coming in with all the trays, . . . and before I know it, my hand was in the gate, between the gate."  He said other inmates saw the incident and would testify about it.

As to his medical care claim, plaintiff testified that on the first day he saw a doctor in the jail about his hand, the doctor wanted to x-ray his chest. "I said, man, there ain't nothin' wrong with my chest. . . . My hand is hurtin'."  Jones testified that instead of x-raying his hand, the doctor sent him back to the dorm, where his hand hurt for a week

before he again saw the doctor.  He stated that the doctor apologized for his earlier confusion and sent him to Earl K. Long Hospital on April 5, 2006, where plaintiff's hand was examined and x-rayed and "they put a half-cast on it."

Jones confirmed that he had received a copy of the medical records that I had previously ordered produced, Record Doc. Nos. 6 and 32, and he stated that the description in the records of the medical treatment he received for his hand was accurate. He confirmed the references in the medical records that, after his initial trip to the hospital for x-rays, he was transported to the hospital a second time about two weeks later and then again in June, when additional x-rays were taken.

Asked about the current condition of his hand, he said, "My hand is all right now. . . . It's hurting a little bit."  He complained, however, that "they were supposed to fix my hand, and they didn't."  He said he had a big lump on the top of his hand where it was broken.  He stated that his hand should have been reset, but instead the doctors simply x-rayed it, placed it in a half-cast wrapped in a bandage and sent him back to the jail without fixing the lump.  He said the half-cast was on his hand until June 2006, and "when they took it off, . . . I tried to work, and I hit it with a shovel and . . . it went right back to hurting." He said he could not even write with his right hand.  He confirmed that he had been given Tylenol and ice for the swelling in his hand at some points in time.

5

Jones denied that his hand had been broken previously at any time <u>before</u> his arrest. He stated that "when I got there [the St. Tammany Parish jail], there wasn't nothing wrong with my hand. . . . When I came to jail my hand was perfect."

He identified defendant Dr. French as the doctor who had failed to give him proper treatment for his broken hand. Jones also complained that the psychiatrist at the St. Tammany Parish jail, defendant Dr. Higgins, had improperly failed to give him medications for his psychiatric condition. Plaintiff said, "I hear voices and see things," and he alleged that Dr. Higgins made no prescriptions of medications for these problems, despite having received Jones's past medical records informing him about his psychiatric problems and showing his history of taking medications for those conditions.

Plaintiff testified that he was seen by Dr. Higgins "three or four times while I was at St. Tammany." He stated that his description of his problems with Dr. Higgins was included in the grievance forms attached to his complaint. Jones alleged that he takes thorazine twice a day for his psychiatric problems, but Dr. Higgins refused to give him his psychiatric medications and did not tell him why. He said a nurse told him Dr. Higgins would not prescribe psychiatric medications for him "because you called him a faggot, but that ain't no reason for me not to get my medication."

Asked what problems he suffered in the St. Tammany Parish jail because he was not receiving medication for his psychiatric problems, Jones said, "I lost weight. . . . I

6

was stone crazy out my mind in St. Tammany.  I couldn't eat.  I couldn't sleep.  I kept hearing voices and people coming after me and everything, because I'm a paranoid schizophrenic."  He stated that he is now receiving the necessary medications for these conditions in the prison facility where he has been transferred.

On cross-examination by defense counsel, Jones initially denied that he had filed other lawsuits while incarcerated, but then acknowledged that he had sued Dr. Higgins once previously in this court based on the same kind of claim stemming from an earlier stint in the St. Tammany Parish jail,[1] and that he had filed a second suit against the St. Tammany Parish sheriff involving a Detective Marvin, both of which were dismissed as frivolous.

The medical records reflect that Jones received substantial care for his broken hand.  The records reflect the following: Jones first requested treatment for his hand on April 3, 2006.  He was seen by a nurse the next day and by Gary J. French, M.D., on April 5th.  Plaintiff told Dr. French that his hand had not hurt until the day after it had been stuck in a gate on March 29, 2006 and that he did not think it was broken.  Dr. French's physical examination of plaintiff's right hand revealed a bony deformity in the fourth metacarpal, a decreased range of motion, sensitivity over the back of the hand and

---

[1]Plaintiff's earlier suit against Dr. Higgins in this court concerning his psychiatric care is styled "Albert C. Jones v. Dr. Higgins et al.," Civil Action No. 04-2612.

bruising.  The doctor diagnosed a fracture, gave Jones a prescription for Ultram[2] and ordered that he be taken to Earl K. Long Hospital ("EKL") for evaluation.

Jones was seen in the emergency room at EKL the same day, where x-rays were taken of his right hand.  The emergency room doctor noted that it was an "unlikely injury for 'crush' in door."  The x-rays revealed an old fracture deformity involving the fourth and possibly the fifth metacarpal, and a possible superimposed nondisplaced acute fracture in the fourth metacarpal.  Although no gross carpal fracture or other significant finding was reported, the radiologist recommended that followup films be taken.

On April 7, 2006, Jones was seen in the prison infirmary.  The medical records indicate that he was verbally abusive, cursing and threatening all medical staff.  He was directed to continue wearing his hand splint and to return on April 13, 2006.  The doctor ordered 650 mg. of Tylenol 4 times a day for 14 days as needed for pain.

Jones was seen in the prison infirmary on April 13, 2006, where he was given a change of ace wrap bandage for his right hand and a prescription for Tylenol for two weeks in the same dosage as at the previous visit.

Plaintiff was taken to EKL on April 20, 2006.  His right hand was x-rayed.  The x-rays revealed a healed fracture deformity at the fourth and fifth metacarpals, but no

---

[2]Ultram (generic name: tramadol hydrochloride) "is prescribed to relieve moderate to moderately severe pain."  PDRhealth, avail. at http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/ult1467.shtml.

acute findings.  The doctor's notes state that the hand never was broken acutely on March 29, 2006 and that no immobilization was needed.  The doctor recommended that Jones start active flexion of his fingers.

On April 30, 2006, plaintiff submitted a sick call request, complaining that his hand hurt, and was told to follow up in medical sick call on that date.  On June 9, 2006, Jones was seen by the nurse.  He complained of hand pain and said he had been working with a weed-eater outdoors.  The nurse noted a bony deformity at the base of his fourth metacarpal near his wrist and soft tissue swelling in the wrist.  The nurse gave Jones Motrin for pain and advised rest, ice, compression and elevation of the wrist.

Jones was examined by a doctor on June 12, 2006.  The doctor noted plaintiff's history of right fourth metacarpal fracture with no need for immobilization.  The doctor stated that the wrist may have been re-injured on June 10, 2006 while the inmate was working with a weed lathe.  The wrist was in a splint and Jones was complaining of wrist pain.  Physical examination revealed some tenderness in his right wrist.  The doctor prescribed analgesics and ordered x-rays.

On June 12, 2006, x-rays revealed an old fracture deformity of the fourth metacarpal.  Someone on the medical staff wrote on the report that plaintiff "has had fracture since arrest!!"  The doctor gave Jones medication, put his right arm in a sling and ordered him not to work until further notice.

9

On June 21, 2006, Dr. French ordered that Jones be continued on no work status indefinitely but stated that he did not need a splint or bandage.

As to his psychiatric care, the medical records show that Jones was regularly seen by a doctor and other medical personnel at the jail.  When plaintiff was screened by medical intake on December 30, 2005, he reported hearing voices coming from inside his brain.  He stated that he had schizophrenia, for which he had been taking Risperdal and Prozac.  The next day, Dr. Dileo gave Jones prescriptions for Risperdal and Prozac for 30 days each.

A health assessment form dated February 4, 2006 and a sick call request dated February 25, 2006 both state that Jones was currently taking Prozac and Seroquel.

Jones saw a doctor on February 28, 2006 for evaluation of paranoid schizophrenia. Plaintiff stated that he was taking Prozac and Seroquel, but he refused to take his drug screen.  The doctor diagnosed paranoid schizophrenia and questionable malingering and ordered that plaintiff's pre-incarceration psychiatric medical records be obtained.

Plaintiff's prescriptions for Prozac and Seroquel were renewed on March 9, 2006. He underwent psychiatric evaluation at the jail on April 7, 2006.  He reported continuing to hear voices in his head.  The medical records further reflect that he attempted to explain something [unreadable] about his medications, but then began to curse, threaten and call the doctor names.  Dr. Higgins observed no evidence of suicidal/homicidal

10

ideation or delusions.  He diagnosed alcohol dependence and rule out malingering for medications.  Dr. Higgins ordered that "no psych medications [were] necessary at this time" and ordered followup in six weeks to re-evaluate his diagnosis.

On May 19, 2006, plaintiff was seen for followup.  He reported some back pain from using a weed-eater but had no other complaints.  Dr. Higgins diagnosed alcohol dependence and ordered that "no psych medications" were necessary.

## ANALYSIS

### I.    STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'"  Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"  Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  <u>Spears</u>, 766 F.2d at 180.  "[T]he <u>Spears</u> procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  <u>Davis</u>, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25, 112 S.Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a <u>Spears</u> hearing."  <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of

12

sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'" <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995)) (citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." <u>Id.</u> at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." <u>Moore</u>, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed at any time under 28 U.S.C. § 1915(e)(2).

In this case, plaintiff's complaint may be dismissed under 28 U.S.C. § 1915(e), either as frivolous because it lacks an arguable basis in law or under Rule 12(b)(6) in

light of his testimony explaining the factual basis of his claims.  Plaintiff's complaint, as amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[3]

II.   <u>MERE NEGLIGENCE</u>

Plaintiff's testimony that his hand was broken when it was slammed in a closing cell door at best asserts a negligence claim, not a claim of civil rights violations cognizable under Section 1983.  Claims arising from allegedly negligent acts do not give rise to relief under Section 1983.

The Supreme Court has held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty or property."  <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986); <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986).  In a number of contexts, other courts have determined that allegations amounting to negligence cannot support a Section 1983 claim.  <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir. 1993) (negligent medical care); <u>Hare v. City of Corinth</u>, 74 F.3d 633, 641-42, 646 (5th Cir. 1996) (negligence insufficient to support failure to protect claim under Section 1983); <u>Eason v. Thaler</u>, 73 F.3d 1322, 1328-29 (5th Cir. 1996) (negligence cannot support Section 1983 action for deprivation of religious rights

_____

[3]Pro se civil rights complaints must be broadly construed, <u>Moore</u>, 30 F.3d at 620, and I have broadly construed the complaint in this case.

or for Eighth Amendment claim based upon prison officials' alleged gross negligence in

permitting a gas leak to occur); Doe v. Taylor Indep. Sch. Dist., 975 F.2d 137, 142 (5th

Cir. 1992), vacated on other grounds, 15 F.3d 443 (5th Cir. 1994) ("Even when

constitutional liberty interests are implicated, not all bodily injuries caused by state actors

give rise to a constitutional tort, for it is well settled that mere negligence does not

constitute a deprivation of due process under the Constitution.").

Plaintiff alleges that prison officials are responsible for his injury because his hand

was broken when it was caught in the closing cell door.  He said that Deputy Hiser closed

the automatic gate "all of a sudden" and that she "wasn't paying attention, I guess, . . . and

before I know it, my hand was in the gate."  Thus, Jones is alleging that Deputy Hiser

accidentally and unknowingly closed the gate on his hand.

These are allegations of garden variety tortious conduct that do not rise to the level

of violations of the Constitution.  Defendants cannot therefore be liable under Section

1983 for the injuries, if any, resulting from the injury alleged by plaintiff, and this claim

should be dismissed as legally frivolous and for failure to state a claim under Section

1983.  If plaintiff wants to pursue tort claims under state law, he is free to do so in state

court.

III.   <u>MEDICAL CARE</u>

It appears that Jones was a pretrial detainee for part of the time and a convicted prisoner at all other times about which he complains about the medical care for the injury to his hand.  Before the Fifth Circuit's decision in <u>Hare</u>, 74 F.3d at 633, it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest.  <u>Bell v. Wolfish</u>,  441 U.S. 520, 539 (1979); <u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992); <u>Cupit v. Jones</u>, 835 F.2d 82, 85 (5th Cir. 1987).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." <u>Pfannstiel v. City of Marion</u>, 918 F.2d 1178, 1186 (5th Cir. 1990), <u>abrogated on other grounds as recognized in</u> <u>Martin v. Thomas</u>, 973 F.2d 449, 455 (5th Cir. 1992).

In <u>Hare</u>, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

<u>Hare</u>, 74 F.3d at 650.  The Fifth Circuit explained that for the <u>Bell</u> "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison

16

official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645.  If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Id.

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors.  Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Id. at 105-06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Hare, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 847 (1994).  The Farmer definition applies to Eighth Amendment medical claims.  Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment.  "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 834 (quotation omitted).  Thus, plaintiff must show deliberate indifference to his "serious medical needs" to satisfy this prong.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993).

Further, the plaintiff must establish that the defendant possessed a culpable state of mind.  Farmer, 511 U.S. at 838 (citing Wilson, 501 U.S. at 298).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  The "deliberate indifference" standard permits courts to separate omissions that "amount

to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Board of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997)) (additional citations omitted) (emphasis added). "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

In the instant case, plaintiff's pleadings as expanded by his testimony establish that nothing more than episodic acts or omissions as defined in Hare are at issue in this case. Thus, the "deliberate indifference" standard applies and plaintiff must allege facts sufficient to establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, Jones fails completely to allege facts sufficient to establish deliberate indifference.

Plaintiff's testimony negates any inference that defendants acted with deliberate indifference to serious medical needs. Initially, it cannot be concluded that the conditions Jones described, an injury to his hand and a self-described paranoid schizophrenia, presented serious medical needs that posed a substantial risk of harm during his incarceration at the jail. Jones testified that his hand is all right now and only hurts a little bit. He complained that he had a big lump on the top of his hand where it had been broken.

19

Plaintiff's complaints about his hand do not rise to the level of a <u>serious</u> medical need for purposes of constitutional analysis.  <u>See</u> <u>Mitchell v. Maynard</u>, 80 F.3d 1433, 1444 (10th Cir. 1996) (broken fingers were not serious medical need when plaintiff failed to complain of injury for two days); <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990) (swollen, bleeding wrists from handcuffs that were too tight do not constitute serious medical need); <u>Dickson v. Colman</u>, 569 F.2d 1310, 1311 (5th Cir. 1978) (inmate who had full range of motion in his shoulder despite continuing pain from old injury did not have serious medical need); <u>Brown v. Mcgregor</u>, No. 105-CV-0216WSD, 2006 WL 2167157, at *6 (N.D. Ga. July 31, 2006) (swollen finger, which turned out to be slight fracture of fourth distal metacarpal, was not a serious medical need when plaintiff failed to seek pain medication or further medical attention after initial examination).

As to his schizophrenia, Jones testified that he lost weight, could not sleep and kept hearing voices.  The medical records reveal no suicidal or other physically harmful ideation.  On at least one occasion, the doctor at the jail diagnosed paranoid schizophrenia and questionable malingering, but at the next two examinations, the doctor abandoned the diagnosis of schizophrenia and instead diagnosed alcohol dependence and rule out malingering for medications.

While some courts have characterized mental illnesses as a "serious medical need" for purposes of constitutional analysis in Section 1983 claims by detainees, they have

20

generally done so in circumstances in which the plaintiff also exhibited seriously harmful or severe symptoms or other ailments in combination with a mental illness sufficient to render plaintiff's overall condition serious.  See Lemaire v. Maass, 745 F. Supp. 623, 636 n.8 (D. Ore. 1990), vacated on other grounds, 12 F.3d 1444 (9th Cir. 1993) (depression in combination with epilepsy, hypertension and vertigo presented serious medical need requiring immediate attention); Gibson v. County of Washoe, 290 F.3d 1175, 1194 (9th Cir. 2002) (manic depressive condition exhibited by wild, physically combative behavior leading to heart attack presented serious medical condition by detainee); Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 16, 18 (1st Cir. 1995) (depression including severe anxiety attacks and other "serious symptoms . . . actually experienced while detained" presumed by the court to constitute serious medical need).  The symptoms described by Jones and the diagnoses by his physicians do not reflect that he had a serious mental health need commensurate with these cases.

Even assuming that plaintiff's hand injury and schizophrenia were serious medical needs for constitutional purposes, he has alleged facts, confirmed by the medical records, that negate any inference of deliberate indifference by jail officials.  Plaintiff's complaint as amended by his testimony shows that he received constitutionally adequate medical care while incarcerated at the St. Tammany Parish jail.  He was provided with regular physical and mental health examinations, x-rays of his hand promptly after he reported

the injury and in later followup visits, treatment for his hand injury (including splinting, medication and relief from work duty) at the hospital and at the jail, and medication for schizophrenia until his doctor changed that diagnosis to alcohol dependence and possible malingering.

Jones acknowledged in his testimony that his hand is all right now and his only real complaint is the existence of a lump in his hand. He stated that his hand should have been reset, but instead the doctors simply x-rayed it, placed it in a half-cast wrapped in a bandage and sent him back to the jail without fixing the lump. He also claimed that the doctor should have prescribed medications for schizophrenia, instead of finding them unnecessary for a period of time..

Although plaintiff has expressed dissatisfaction with the extent or effectiveness of his treatment, none of his allegations rise to the level of deliberate indifference necessary to establish a constitutional violation cognizable under Section 1983.

> [T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

Gobert, 463 F.3d at 346 (footnotes, citations and internal quotations omitted). No such showing has been made on the current record.

Contentions like Jones's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim.  "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged that treatment received for his broken hand was inadequate failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998) (although delay in treating plaintiff's broken hand made surgery impractical and may have been negligent, it did not establish constitutional violation); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson, 910 F.2d at 284 (allegations establishing provision of medical treatment found inconsistent with inference of deliberate indifference).

Therefore, plaintiff's complaints in this case about his medical care advance a legally frivolous argument and fail to state a claim for relief under Section 1983.

IV.   CONDITIONS OF CONFINEMENT:   "THE COOKIE JAR"

Plaintiff asserts that he was exposed to improper conditions of confinement when he was locked in "the cookie jar," a former medical dormitory area where he was confined on two separate occasions for about 12 hours each time.

Jones was a pretrial detainee during part of the time period about which he complains and a convicted inmate during the remainder of the time.  Regardless whether an inmate is a pretrial detainee or a convicted prisoner, however, the standard of liability is the same for episodic acts or omissions of jail officials of the type alleged in this case. Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999); Hamilton v. Lyons, 74 F.3d 99, 104 n.3 (5th Cir. 1996); Hare, 74 F.3d at 650.  In Hare, as previously discussed, the Fifth Circuit held that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs and that a jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to the inmate but responded with deliberate indifference to that risk.  Id.

There is nothing in plaintiff's written submissions or Spears testimony from which it might be inferred that the conditions he described were the result of a prison official's act either "implement[ing] a rule or restriction or otherwise demonstrat[ing] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions

24

were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645. On the contrary, in this case, "'the complained-of harm is a particular act or omission of one or more officials,'" Olabisiomotosho, 185 F.3d at 526 (quoting Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997)), and the deliberate indifference standard described in detail above applies.

As to these particular claims, Jones's allegations do not allege violations of the Constitution. Two requirements must be met before Section 1983 liability will arise for constitutional violations relating to conditions of confinement of the type plaintiff described.

First, the alleged deprivation must objectively be "sufficiently serious," which means that "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 847. To rise to the level of a constitutional violation, the conditions must be "'so serious as to deprive [plaintiff] of the minimal measure of life's necessities,' in this case the basic human need for sanitary conditions." Alexander v. Tippah County, 351 F.3d 626, 630 (5th Cir. 2003) (quoting Woods v. Edwards, 51 F.3d 577, 581 (5th Cir. 1995)).

Second, the inmate must show that a prison official was deliberately indifferent to inmate health or safety. Farmer, 511 U.S. at 847. As previously discussed, this means

25

that a prison official cannot be held liable unless he official knows of and disregards an excessive risk to inmate health or safety.  Id. at 837.

In the instant case, the "deliberate indifference" standard applies because all of plaintiff's complaints concerning the conditions in the jail relate to prison officials' episodic acts or omissions, and no challenge is made to "the general conditions and restrictions of [plaintiff's] confinement, knowingly imposed."  Hamilton, 74 F.3d at 104 n.3.  Thus, Jones must allege facts sufficient to establish that any defendant knew that plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  Plaintiff fails to allege any such facts when he complains about the short-term conditions he experienced in the "cookie jar," specifically that it was very cold and there was "spit and everything all in the toilets, dirty trays on the floor, and all kind of shit all over it."

Jones has failed to allege either deprivations so extreme that they violate the Constitution or sufficiently serious harm resulting from these problems to meet the requirements of Farmer, and this claim does not rise to the level of a constitutional violation.  The temporary conditions that Jones experienced for only a short time did not result in "sufficiently serious" conditions posing "a substantial risk of serious harm." Farmer, 511 U.S. at 834.

26

A short term sanitation restriction or problem, although admittedly unpleasant, does not amount to a constitutional violation.  Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994); Knop v. Johnson, 977 F.2d 996, 1013 (6th Cir. 1992); Robinson v. Illinois State Corr. Ctr., 890 F. Supp. 715, 720 (N.D. Ill. 1995).  "[J]ails must provide only reasonably adequate hygiene and sanitation conditions."  Burton v. Cameron County, 884 F. Supp. 234, 241 (S.D. Tex. 1995) (citing Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986)).  None of  Jones's allegations about the conditions at the jail establish constitutional violations.  Serving time in prison "is not a guarantee that one will be safe from life's occasional inconveniences."  Holloway v. Gunnell, 685 F.2d 150, 156 (5th Cir. 1982).  Courts have repeatedly held "that the Constitution does not mandate prisons with comfortable surroundings or commodious conditions."  Talib v. Gilley, 138 F.3d 211, 215 (5th Cir. 1998) (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

Jones's complaint that his constitutional rights were violated by the temporary conditions are wholly without merit.  Plaintiff simply cannot show that defendants were aware of facts from which they inferred that the unsanitary conditions and cold temperatures posed a substantial risk of serious harm and that they intentionally chose to disregard that risk.

In two cases, the Fifth Circuit has held that virtually permanent conditions of cells that contained excrement and other filth violate the Eighth Amendment.  In Harper v.

27

Showers, 174 F.3d 716, 716 (5th Cir. 1999), there were "continual" conditions of "filthy, sometimes feces-smeared cells," and in Gates v. Cook, 376 F.3d 323, 338 (5th Cir. 2004), there were "'extremely filthy' [cells] with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls."

By contrast, in Davis, the Fifth Circuit found no constitutional violation when a prisoner was locked in a "management cell" for three days, where the cell was, "according to Davis, 'just filthy, with 'blood on the walls and excretion on the floors and bread loaf on the floor.'" Davis, 157 F.3d at 1004, 1006.  The appeals court quoted the Supreme Court's holding that "'the length of confinement cannot be ignored. . . .  A filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months.'"  Id. at 1006 (quoting Hutto v. Finney, 437 U.S. 678, 686-87 (1978)).  The Fifth Circuit found that "Davis did not suffer an extreme deprivation of any 'minimal civilized measure of life's necessities'" when he  was confined in the cell for only three days.  Id. (quoting Wilson, 501 U.S. at 304).

In the instant case, Jones was confined in the "cookie jar" for only 12 hours on only two separate days some time apart.  Because his case clearly falls within the ambit of the Fifth Circuit's holding in Davis, id. at 1006, that a three-day confinement in such a cell is not unconstitutional, this claim advances a legally frivolous argument and fails to state a claim for relief under Section 1983.

28

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's claims pursuant to 42 U.S.C. § 1983 be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ____1st____ day of February, 2007.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE